IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CT-3039-D

| | | |
|---|---|---|
| HOMER AVERY WOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| BETH CHADWICK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

On April 1, 2010, Homer Avery Wood ("Wood" or "plaintiff"), a state inmate proceeding pro se, filed this action pursuant to 42 U.S.C. § 1983 [D.E. 1]. Wood seeks leave to proceed in forma pauperis [D.E. 2]. On April 18, 2011, the court reviewed the action pursuant to 28 U.S.C. § 1915A, and allowed plaintiff's claim alleging deliberate indifference to a serious medical need to proceed against five defendants [D.E. 5]. On December 12, 2011, defendants Micklos and Smith moved for summary judgment [D.E. 51, 54]. On December 30, 2011, defendants Padgett, Meadow, and Hester ("the PMH defendants") moved for summary judgment [D.E. 58]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified Wood about the motions for summary judgment, the consequences of failing to respond, and the response deadlines [D.E. 55–56, 60].

On January 10, 2012, the court granted defendant Smith's motion for summary judgment and ruled on several other motions [D.E. 62]. The court allowed Wood "until February 17, 2012, to file a single response in opposition to the remaining motions for summary judgment." Id. 4. Despite the court's order, on February 16, 2012, Wood filed a response in opposition to defendant Micklos's motion for summary judgment [D.E. 63] and sought an extension of time to file a separate response

to the PMH defendants' motion for summary judgment [D.E. 64], which the clerk allowed [D.E. 65]. On March 12, 2012, Wood filed a response in opposition to the PMH defendants' motion for summary judgment [D.E. 68]. On March 29, 2012, having obtained an extension of time [D.E. 66–67], defendant Micklos filed a supplemental affidavit and reply in support of his motion for summary judgment [D.E. 69–70]. On April 17, 2012, Wood filed a motion to amend his complaint [D.E. 71]. As explained below, the court grants defendants' motions for summary judgment and denies plaintiff's motion to amend.

I.

The court first addresses Wood's motion to amend. Courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "belated claims which change the character of litigation are not favored." Smith v. Angelone, 111 F.3d 1126, 1134 (4th Cir. 1997) (internal quotations, alteration, and citation omitted). Additionally, the court is not required to grant a plaintiff leave to amend when "the amendment would be futile." Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999) (quotation omitted). Wood seeks to amend his complaint because he "may have raised issues of constitutional violations in his Summary Judgment Opposition Motions that were not openly set fo[]rth in the original complaint." Mot. Amend [D.E. 71] 3. Moreover, Wood seeks to include allegations concerning different "constitutional violations of date 27th of April 2010 until present date." Id. 3–7.

Because Wood seeks to add claims which arose after he filed this action, he could not have exhausted administrative remedies as to these new claims before commencing the action. The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see Woodford v.

2

Ngo, 548 U.S. 81, 83–85 (2006); Porter v. Nussle, 534 U.S. 516, 524 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532; see Jones v. Bock, 549 U.S. 199, 211 (2007). A prisoner must exhaust administrative remedies "regardless of the relief offered through administrative procedures." Booth v. Churner, 532 U.S. 731, 740–41 (2001). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." Jones, 549 U.S. at 211. Filing suit before exhausting administrative remedies dooms the action. See, e.g., Ford v. Johnson, 362 F.3d 395, 398 (7th Cir. 2004); Johnson v. Jones, 340 F.3d 624, 627–28 (8th Cir. 2003).

When an inmate files suit early, courts typically dismiss the action (or unexhausted claims) without prejudice. See, e.g., Ford, 362 F.3d at 401; Johnson v. Cannon, C.A. No. 4:08-776-PMD, 2010 WL 936706, at *8 (D.S.C. Mar. 15, 2010) (unpublished); Shouse v. Madsen, No. 7:09-cv-00461, 2010 WL 276543, at *1 (W.D. Va. Jan. 19, 2010) (unpublished). A dismissal without prejudice allows the prisoner an opportunity to exhaust the administrative process and then file a new suit, if the prisoner so chooses. Accordingly, the court denies Wood's motion to amend and dismisses his unexhausted claims without prejudice.

II.

On February 25, 2009, Wood was convicted of several narcotics-related offenses and sentenced as a habitual offender to a term of imprisonment of 107 to 138 months. See N.C. Div. Adult Prisons, Pub.OffenderInfo.,http://webapps6.doc.state.nc.us/opi/viewoffender.do?method =view&offenderID=0451213&searchOffenderId=0451213&listurl=pagelistoffendersearch results&listpage=1 (last visited Apr. 25, 2012). Wood apparently was in the state prison system before his 2009 reincarceration, but after Micklos ceased treating him on March 14, 2008. See, e.g.,

3

Resp. Opp'n Micklos Mot. Summ. J. [D.E. 63] 12 (describing "untreated agony and horridness resulting in another approval and order for Methadone Pain Management on 5/5/08") & Ex. 4B (5/5/08 medical note). Wood acknowledges that 2007 is "the year of the complaint," id. 25, and the court does not address any allegations relating to acts occurring after March 2008. Cf. id. 27 (describing actions by a physician at Pasquotank Correctional Institution in 2010), 45 (stating that Wood "'again fell unconscious' in the chow line" in February 2012), 51 (same); Resp. Opp'n PMH Defs.' Mot. Summ. J. 17–20 (describing health issues and treatment in 2009–2011). Rather, the court limits its discussion to those facts relevant to Wood's remaining claims, which span a time period between April 2007 and March 2008. Compl. [D.E. 1] 7; Micklos Aff. [D.E. 52] ¶ 4.

Wood has been diagnosed with "post-laminectomy syndrome" following a spinal fusion performed in the 1980's and suffers from a "neurological disorder and insufferable pain" as a result. Compl. 6; Resp. Opp'n Micklos Mot. Summ. J., Ex. 4E; Micklos Aff. ¶ 6 & Ex. 3. Wood has required medical treatment for severe pain for many years, and before his incarceration, was successfully treated with morphine. Compl. 4; Weeks Decl. [D.E. 45] 1–2. During the period of incarceration relevant to the complaint, Wood received various treatments within the Division of Adult Prisons, including antibiotics, radiology studies, specialist referrals, and pain medication. See, e.g., Micklos Aff. ¶ 132. Before Wood's transfer to Pender Correctional Institution ("Pender"), at least one physician diagnosed Wood with possible opiate dependence. Id. ¶¶ 7–8 & Exs. 4–5.[1]

Micklos began treating Wood on April 11, 2007, when Wood transferred to Pender, and

---

[1] Wood disputes that he has any narcotic addiction, and states that "opiate dependence does not necessarily mean an opiate addict or addiction, it simply means that because of prevailing medical condition the recipient of the medication is dependent on the medical treatment because of the extremity of the disease." Resp. Opp'n Micklos Mot. Summ. J., Ex. 1; see also Resp. Opp'n PMH Defs.' Mot. Summ. J. 8, 32–33. Whether Wood is actually addicted to any medication does not preclude summary judgment.

4

ceased treating Wood on March 14, 2008, when Wood completed his term of incarceration. Micklos Aff. ¶ 4; see Compl. 7 ("actual indicative date is 1st of May 2007 through April 2008"). According to Micklos,

> Between the dates of April 11, 2007 through March 14, 2008 . . . , [Micklos] personally examined . . . Wood on at least four (4) occasions and performed chart reviews of his medical record on at least fifteen (15) occasions. [Micklos] also gave telephone orders when necessary on at least three (3) occasions and over eight (8) UR Requests were submitted for various treatment modalities, including, but not limited to, radiology studies, pharmacy, and specialist referrals . . . . Wood was examined by nurses in sick call appointments on at least nineteen (19) occasions. . . . [and] was referred to the Neurology Clinic for pain management on at least two (2) occasions and underwent at least one (1) radiographic study of his back.
>
> . . .
>
> In response to . . . Woods's [sic] complaints of chronic pain, [Micklos] prescribed and/or renewed several medications, including: Neurontin, Depakene, Elavil, Baclofen, Ibuprofen, Percocet, Tramadol and Methadone and adjusted his dosage numerous times to address his pain. [Micklos] ordered a hepatic function panel to ensure his prescribed pain medicines were not interfering or causing damage to his liver . . . . Wood's Neurontin serum levels were tested to monitor the amount of Neurontin in his system to ensure the drug was being taken appropriately and at a safe level.
>
> . . .
>
> For . . . Wood's complaints regarding his stomach, . . . Wood was prescribed Zantac, Pepcid, Tagamet, Lactulose, Colace, and a UR Request for a gastroenterology consultation was submitted, which was denied by the UR reviewer. [Micklos] did not participate in the review or denial of this UR Request . . . . Wood was also treated by a dietician, who made diet recommendations.
>
> For . . . Wood's purported staph infection, he was prescribed Bactroban and instructed on how to apply the ointment to prevent further infection. For . . . Wood's lipoma and dermatitis, [Micklos] prescribed Triamcinolone (topical steroid) and ordered a UR Request for a surgical consultation, which was denied by the UR reviewer because it was deemed a cosmetic issue. [Micklos] did not participate in the review or denial of the UR Request.
>
> To monitor . . . Wood's health, [Micklos] ordered lab work and tests, including an EKG and a liver function test.

Micklos Aff. ¶ 65. Additionally, "MRIs and plain films of . . . Wood's spine" did not indicate any

5

"definite surgical nerve impairment." Id. ¶ 45. Wood does not dispute that he received all of these examinations, tests, and other measures, although he notes that Micklos "did multiple chart reviews because [Wood] filed multiple sick calls." Resp. Opp'n Micklos Mot. Summ. J. 57. Wood also contends that "Neuro[ntin], elevelle, ultram, tylenol, [and] ibuprofen [are in]effective in treating neurological diseases with extensive and tra[u]matic nerve damage, (namely postlaminectomy syndrome)." Id. 5.

Despite the Pender medical staff's efforts and Wood's extensive treatment, Wood repeatedly sought changes to his medication regimen and increased doses of narcotic medications. See, e.g., Micklos Aff. ¶¶ 14, 17–18, 23, 28, 38, 42, 45, 49 & Exs. 10–13, 17, 20, 28, 32, 34, 38; Padgett Aff. [D.E. 59-1] ¶ 9. Wood also repeatedly complained of gastro-intestinal discomfort, a recognized side effect of high doses of narcotic medication. See, e.g., Micklos Aff. ¶¶ 28, 33, 36, 42, 44 & Exs. 20, 24, 27, 32–33. Additionally, Wood failed to appear for several appointments scheduled in response to his sick call requests. Id. ¶¶ 26, 33, 38, 41 & Exs. 18, 24, 28, 31. Thus, on November 7, 2007, defendant Padgett,

> the Nurse Supervisor at Pender[,] coordinated a medical staffing meeting . . . with the appropriate Pender custody, administration, and nursing staff as well as regional physicians in order to assist in the resolution of [Wood]'s continuous complaints of need for increases of his prescribed dosage of narcotic medication . . . . Medical staff, custody staff, and regional administrative staff met with [Wood]. He was allowed to address his medical concerns including his physical condition and his medication issues. With [Wood]'s participation and agreement, a plan was developed to meet his medical needs. That plan included checking serum medication levels, changing medication orders to aid in histamine production and control, requesting the patient to follow policy and procedure in seeking medical services, requesting the patient to present to medical staff and the doctor copies of the court papers he insisted he had which indicated which medications he was to receive in DOC for his complaints of pain, setting limits regarding expectations for pain management, and appropriate regard for seeking medical services (in reference to [Wood]'s frequent and repetitive sick call requests, grievances, and self-declared medical emergencies which were not true life-threatening medical emergencies; example: declared emergency for constipation).

6

Padgett Aff. ¶ 7 & Ex. A; see also Micklos Aff. ¶ 45 & Ex. 34; Resp. Opp'n PMH Defs.' Mot. Summ. J. 9. The medical staff decided to check Wood's Neurontin serum levels and to taper him off Methadone. Micklos Aff. ¶ 45.

Micklos "was careful to taper . . . Wood's doses of Methadone and ensured he was receiving sufficient pain medication." Micklos Aff. ¶ 65. Micklos made the decision to taper Wood off Methadone because "Wood was exhibiting increased tolerance to the Methadone which was rendering the drug ineffective and [Micklos] felt it was in his best interest to decrease his Methadone." Id. Micklos "also ordered Tramadol (narcotic-like pain reliever)" to replace the Methadone. Id. ¶ 46 & Exs. 34–35. Micklos acknowledges that some of his treatment decisions concerning Wood's Methadone prescription were guided by a "particular[] sensitiv[ity] to inmate requests for pain medication because abuse of such medication is a common occurrence among the prison population" and "[i]nmates will often engage in drug-seeking behavior by continuously seeking pain medication from multiple healthcare providers." Id. 7 n.6.

The results of Wood's Neurontin serum test "reflected that no Neurontin was detected in . . . Wood's blood, which was not consistent with what had been prescribed to him." Micklos Aff. ¶ 47 (emphasis in original) & Ex. 36. At that time, Wood was being prescribed a total of 2700 mg of Neurontin a day. Id. ¶ 43 & Ex. 29. Wood states that he "'refused neuro[ntin],' even to the point of insufferably having nothing to treat his pain, . . . because, . . . plaintiff could not get any relief out of even high doses of neuro[ntin], . . . and because of plaintiff's degenerative and life long problematic stomach disease[.]" Resp. Opp'n Micklos Mot. Summ. J. 35.

Defendant Padgett also provided medical care to Wood while he was confined at Pender for his complaints of pain and constipation. Padgett Aff. ¶ 10. Because Padgett is a nurse rather than a doctor, she "lacked authority to review orders of . . . any . . . physicians and decide whether to

7

implement same . . . . [and] could not change the ordered dosage of [Wood]'s prescribed narcotic medications." Id.; see also Micklos Aff. ¶ 65. Wood asserts that Padgett's treatment was guided by "a deprivative sanctional mindset and a fixed mental attitude of determined medical deprivation concerning 'narcotics,' especially being firm, staunch, and steadfast in her 'non belief' of treating neurological disease by an appropriate narcotic means or by medical approval[.]" Resp. Opp'n PMH Defs.' Mot. Summ. J. 6. Wood further asserts that during his intake examination upon his transfer to Pender, Padgett "screamed out yelling in a high pitch voice, that narcotics was not going to be dispersed at this facility and that narcotic dispersement [sic] was going to stop here and now" and that at an examination with Micklos, Padgett "purposely caused a disruption by shrilly screaming multiple phrases, multiple times . . . ." Id. 6–7.

As for defendants Meadows and Hester, Meadows was a grievance screening officer at Pender during the time frame alleged in Wood's complaint. Compl. 12. Wood alleges that Meadows "intentionally changed [and] misleadingly reworded" several of Wood's grievances pertaining to his medical care "as to impede the true and accountable meaning of [the] grievances[,]" in an apparent "plot or sc[h]eme to . . . conspire or comply with medical decisions" concerning Wood's treatment. Id. 13. Wood states that because Meadows was "willing[] to patiently listen attentively at length to plaintiff's associative medical grievance explanatory statements, he was very aware of plaintiff's exact medical complications and . . . . could have made a difference in the prevailing unconstitutional deprivation and maliciously de[gen]erate behavior [o]ccurring at Pender Medical, but instead he chose to rephrase" Wood's grievances. Resp. Opp'n PMH Defs.' Mot. Summ. J. 40–41. Defendant Hester was the head grievance officer at Pender. Compl. 13. Hester provided a final review of Wood's grievances and denied them "with the very intent of conspiring or complying with medical to inflict pain and suffering resulting in cruel and unusual punishment

8

. . . ." Id. 14. Hester "presented a very extreme strong-arm approach and tactic while downplaying plaintiff's sufferance or lack of treatment thereof and displaying a contemptuous belittling and demeritorious demeanor at the very mention of narcotic treatment." Resp. Opp'n PMH Defs.' Mot. Summ. J. 42.

III.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

In order to establish an Eighth Amendment claim for denial of medical care, a prisoner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation omitted).

9

Deliberate indifference requires that a defendant know of and purposefully ignore "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. It is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley v. Albers, 475 U.S. 312, 319 (1986), abrogated on other grounds by Wilkins v. Gaddy, 130 S. Ct. 1175 (2010). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241. "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

Micklos "acknowledges that [Wood]'s alleged injury was sufficiently serious to trigger the objective prong of a [section] 1983 action" but contends that he is entitled to summary judgment because the medical record shows that he provided an extensive range of treatment to Wood. Mem. Supp. Mot. Summ. J. 28–33. Wood responds that Micklos's decision to taper Wood's Methadone was contrary to a chronic pain management plan implemented by a neurologist at Central Prison. Resp. Opp'n Micklos Mot. Summ. J. 9–10. Wood also contends that Micklos and Padgett made treatment decisions based on "a negative viewpoint toward ... inmates who[] seek pain management at [Pender]" and on a "'non belief[]' of treating neurological disease by an appropriate narcotic means[.]" Id. 6; Resp. Opp'n PMH Defs.' Mot. Summ. J. 6.

Wood's medical treatment does not rise to a level of deliberate indifference. See, e.g., Johnson v. Quinones, 145 F.3d 164, 169 (4th Cir. 1998); Lacy v. Shaw, 357 F. App'x 607, 610 (5th Cir. 2009) (per curiam) (unpublished); Kimpel v. Cal. Dep't of Corrs., No. 08CV1734-LAB(JMA), 2010 WL 532522, at *5 (S.D. Cal. Feb. 8, 2010) (unpublished); Atakpu v. Lawson, No. 1:05-CV-

00524, 2008 WL 5233467, at *11 (S.D. Ohio Dec. 11, 2008) (unpublished); McManus v. Schilling, No. 2:07cv74, 2008 WL 682577, at *8 (E.D. Va. Mar. 7, 2008) (unpublished). Moreover, to the extent that Wood uses a pain management plan by a neurologist at Central Prison to question Micklos's medical decisions, a disagreement between medical professionals on the appropriate course of treatment does not reflect deliberate indifference. See, e.g., United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977). Finally, as for Wood's contention that Padgett yelled at him during two examinations, Padgett's alleged conduct does not rise to the level of deliberate indifference. See, e.g., Brown v. Darnold, Civil No. 09–240–GPM, 2011 WL 4336724, at *4 (S.D. Ill. Sept. 14, 2011); Ryals v. Aschberger, Civil Action No. H-09-1741, 2009 WL 1749420, at *3–4 (S.D. Tex. June 18, 2009) (unpublished). Thus, Micklos and Padgett are entitled to summary judgment.

As for defendants Meadows and Hester, Wood's allegations and contentions concerning their improper handling of his grievances does not rise to the level of a constitutional claim. See Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). Thus, Meadows and Hester are entitled to summary judgment.

IV.

For the reasons stated, the court GRANTS defendants' motions for summary judgment [D.E. 51, 58] and DENIES plaintiff's motion to amend [D.E. 71]. The Clerk of Court shall close the case.

SO ORDERED. This 26 day of April 2012.

JAMES C. DEVER III
Chief United States District Judge

11